

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00238-CV

_____


IN RE: THE COMMITTMENT OF JESUS JESSE GONZALEZ

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. DC89-CV2019-0817

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

In seven issues, Appellant Jesus Jesse Gonzalez appeals an order of civil commitment after a jury found him to be a sexually violent predator (an SVP).

In his first issue, Gonzalez argues that the charge was not sufficiently specific for the jury to realize that certain allegations could be considered only as a basis for the State's expert's opinion and not for the truth of the matters asserted. Because Gonzalez's complaint does not match the one he made in the trial court, we hold that it was not preserved for appeal. Also, the refusal to submit Gonzalez's proposed instruction was not an abuse of discretion.

In his second and third issues, Gonzalez challenges the legal and factual sufficiency of the evidence supporting the behavioral-abnormality prong of the jury's SVP finding, arguing that his most recent sexual conviction involved an intentional act and that he could not have committed an intentional act if he has a predisposition to commit sexually violent offenses. We hold that the evidence is legally and factually sufficient to support the behavioral-abnormality determination because the statute describing SVPs specifically lists offenses with an intentional mens rea and contemplates that an SVP can have a predisposition to commit a sexually violent offense, as well as the capability to form an intentional mens rea.

In his fourth and fifth issues, Gonzalez argues that the trial court abused its discretion by allowing the State to read its expert's deposition testimony regarding

2

"mere allegations of prior sexual offenses" and unadjudicated extraneous offenses and that the probative value of such offenses was substantially outweighed by their prejudicial effect. We conclude that the challenged evidence was relevant for the jury to reach its decision, that such evidence was not unduly prejudicial, and that no abuse of discretion occurred when the expert was allowed to testify about having relied on the challenged allegations in forming his opinion on the existence of a behavioral abnormality.

In his sixth issue, Gonzalez argues that the State's expert's testimony is not reliable. We hold that Gonzalez failed to object at trial to preserve this issue for appeal and that such issue does not present fundamental error capable of review on appeal if not preserved at trial.

In his seventh issue, Gonzalez argues that he was denied effective assistance of counsel when his initial trial counsel waived his right to a trial within a statutorily required (but waivable) deadline of 270 days after service of a commitment petition by agreeing to a continuance without consulting him and without a judicial determination that he would suffer no substantial prejudice. Due to Gonzalez's failure to argue—and the lack of record evidence to show—that he was prejudiced by the continuance, Gonzalez has not shown that he received ineffective assistance.

Because we rule against Gonzalez on each of his seven issues, we affirm the trial court's civil-commitment order.

3

## II. Factual and Procedural Background

### A. The Sexual Offense Convictions

In 1995, Gonzalez pleaded guilty to committing the offense of indecency with a child in 1992. Pursuant to the terms of the plea bargain, the trial court sentenced Gonzalez to six years' confinement.

In 2007, Gonzalez pleaded guilty to committing the offense of indecency with a child in 2006 and was sentenced to fifteen years' confinement.

### B. The Petition Requesting Commitment

In 2019, before Gonzalez's scheduled release date of July 24, 2021, the State filed a petition alleging that Gonzalez is an SVP and requesting that he be committed for treatment and supervision pursuant to Chapter 841 of the Texas Health and Safety Code (the SVP Act). Both sides requested a jury trial.

### C. The Trial's Postponement Due to COVID-19

In January 2020, the trial court signed a scheduling order setting Gonzalez's case for trial on July 20, 2020, which was 262 days after his initial trial counsel had filed a notice of appearance.[1] After that order was issued, the COVID-19 pandemic hit, and the Texas Supreme Court began issuing emergency orders that restricted the trial courts' ability to conduct jury trials.

---

[1]The applicable statute calculates the 270-day deadline from when "the petition is served on the person." *See* Tex. Health & Safety Code Ann. § 841.061(a)(1). Because the record does not contain that information and because the State does not dispute that counsel agreed to waive the deadline, we reference the date that the initial trial counsel filed a notice of appearance as an approximate benchmark.

4

The record contains a Rule 11 agreement in which the parties agreed to reset the trial to August 31, 2020—a date more than 270 days after the date that Gonzalez's initial trial counsel filed a notice of appearance. The Rule 11 agreement stated that the August 31, 2020 trial setting would not substantially prejudice Gonzalez, "even though it [would] occur[] after the 270th day after the [p]etition was served." The Rule 11 agreement was signed by Gonzalez's initial trial counsel.

Later, Gonzalez's initial trial counsel withdrew, and Gonzalez's new counsel filed a motion to dismiss based on a violation of the 270-day statutory deadline for holding a trial under the SVP Act. The motion to dismiss stated that Gonzalez had not been consulted about waiving or giving up his right to be tried within 270 days of the service of the petition. The State filed a response, noting that whether or not Gonzalez had been consulted about continuing the trial date past the 270-day statutory deadline was not material because (1) the trial court could continue the trial "in the due administration of justice" as long as the continuance did not go past Gonzalez's discharge date, and (2) due to the COVID-19 pandemic and the Texas Supreme Court's emergency orders, "[e]ssentially, in-person jury proceedings were simply not occurring." The trial court denied the motion.

### D.    The Jury Trial

The trial ultimately began on June 7, 2021.  Only two witnesses testified at the trial:  the State's expert, psychologist Dr. Jason Dale Dunham, testified by deposition, and Gonzalez testified in person.

### 1.    Dr. Dunham's Deposition Testimony

After reviewing records that were sent to him and conducting an examination of Gonzalez in December 2019, Dr. Dunham concluded that Gonzalez has a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence to the extent that he becomes a menace to the health and safety of others. With regard to the records that Dr. Dunham reviewed, he explained that they included criminal offenses other than the sexual offenses; those other offenses included possession of cocaine, possession of marijuana, "dangerous drug delivery," driving while intoxicated, public intoxication, failure to register, and assault–bodily injury.  Dr. Dunham also took into account an unadjudicated offense in which Gonzalez had been charged with sexually assaulting his deaf relative.  Gonzalez acknowledged in his interview a portion of what was in his criminal records but denied most everything that he had been accused of whether it was a sex-offense conviction, a nonsexual crime, or a prison-disciplinary offense; Dr. Dunham did not find Gonzalez to be credible when he examined Gonzalez.  Dr. Dunham said that those other criminal cases led him to diagnose Gonzalez with "provisional antisocial

6

personality" disorder based on the number of times that Gonzalez had been in trouble, showing that he has a hard time following rules in society.

Dr. Dunham testified that the examination had lasted an hour and a half and had consisted mostly of Gonzalez complaining and being agitated. According to Dr. Dunham, Gonzalez was controlling and "wanted to talk about what he wanted to talk about and kind of sidestepped most of [Dr. Dunham's] questions in order to continue to complain. And he kind of held a pretty extreme victimstance throughout the whole evaluation." Gonzalez complained about his previous attorneys, the court system, the jail, previous evaluators, and his victims.

Dr. Dunham testified about the methodology that he had used in arriving at his opinion that Gonzalez has a behavioral abnormality. Dr. Dunham used a clinically adjusted actuarial approach and made the following diagnoses: (1) pedophilic disorder, sexually attracted to females, nonexclusive type; (2) antisocial-personality disorder, provisional; and (3) history of substance-use disorder. Dr. Dunham explained that pedophilic disorder is sexual arousal to pre-pubescent children that is usually characterized by fantasies or behaviors against children. Dr. Dunham said that this diagnosis was based on Gonzalez's victims; both of his convictions involved pre-pubescent girls, and there was a pattern over a number of years of numerous instances of sexually offending against young girls. Dr. Dunham also diagnosed Gonzalez with psychopathy due to the types of behaviors that he had committed and to the way that he had interacted with other people.

Dr. Dunham testified that the factors that had contributed to Gonzalez's behavioral abnormality include "[h]is sexual deviancy, in particular, his pedophilia, and also his antisocial orientation, and more specifically, his psychopathic personality disorder." Additionally, the events from Gonzalez's childhood that contributed to the overall opinion in this case were his conduct-disorder behaviors, which included dropping out of school around age twelve, starting to use drugs and alcohol around that age, and getting arrested a couple of times as a juvenile.

With regard to protective factors against reoffending, Dr. Dunham determined Gonzalez's age and his institutional adjustment to be protective. As risk factors for reoffending, Dr. Dunham listed the number of Gonzalez's victims, which extended beyond his convictions; the pattern of behavior that was spread out over twelve years; the fact that he had reoffended after incarceration, that the victims were children and were unrelated to him, and that some of the acts included physical acts of force and threatening to kill someone if the victim told; his antisocial-personality disorder; his substance abuse; and his poor dynamic risk factors (i.e., lacking remorse, blaming victims, and poorly appraising his own risk).

Overall, the testing that Dr. Dunham performed on Gonzalez revealed a high level of psychopathy and an average risk of reoffending when compared to other sex offenders. Dr. Dunham did not believe that releasing Gonzalez to a halfway house would be enough to keep the community safe from Gonzalez.

Before the deposition concluded, Dr. Dunham was asked to read the notes that he had taken during his examination of Gonzalez. As Dr. Dunham read his notes, he mentioned several times that Gonzalez was controlling the interview and that he said that people had lied.[2]

When Dr. Dunham asked Gonzalez about his 1995 indecency-with-a-child conviction, Gonzalez said,

> I was on drugs at that time and into pornography and [*Playboy*] magazines. I was in the pool in an apartment complex. She started messing with me, pulling my shorts down. It started from there. I did things I shouldn't be doing. Her mom found out and called the police.

Gonzalez said that the girl was nine to eleven years old and that he had fondled her for about a week before her mom had called the police.

Regarding the 2007 conviction for indecency with a child, Dr. Dunham read his notes regarding what Gonzalez had said,

> At that time, I was high [on cocaine, crack, marijuana, whiskey, and beer] and all that. Those [two] girls had already sent someone else to prison, an uncle or grandfather. They seemed to play that game a lot. When I first met them at that trailer park, they were always looking at dirty . . . movies. They had [*Playboy*] magazines they got from their dad. They had like 60 magazines they could get to. They were doing . . . things, also.
>
> The only thing that happened, I was in the bedroom. I asked if they wanted to see me masturbate. They said[, "Y]es.["]

---

[2]According to Dr. Dunham's testimony prior to reading his notes, Gonzalez told him that his victims were liars and were manipulative, that they had set people up, and that they were in need of help.

Dr. Dunham thought that Gonzalez had said to the girls, "Do you want to touch me?" But Dr. Dunham's notes said that Gonzalez had asked the girls, "Do you want me to touch you?"[3] Gonzalez said that the girls responded affirmatively. He said that this happened five to six times. Later, the girls told their father what Gonzalez had done. Gonzalez said, "These girls lied and said I put a sock in their mouth and threatened to kill them. That's a lie." During follow-up questions, Gonzalez said that there was no penetration, just masturbation. Gonzalez believed that the girls had conspired to get people in trouble: "[T]hey would come onto people and then tell on them whenever somebody would act on it."

Dr. Dunham asked Gonzalez about the unadjudicated charge that involved his deaf relative. He said that he had called out one of his sisters because he was concerned about who she was hanging around and that sister had hated him ever since. Gonzalez said that she had accused him of "doing something" with their deaf relative, who was an adult at the time, but that nothing had ever happened.

Gonzalez told Dr. Dunham that he was on the road to recovery, that he did not need to be civilly committed, and that he did not need any psychiatric help. But based on Dr. Dunham's examination of Gonzalez, Dr. Dunham opined that Gonzalez is within the small but extremely dangerous group of sexual predators that the legislature described in the SVP Act (i.e., those who require civil commitment).

---

[3]Later in his notes, Dr. Dunham saw that when he had asked Gonzalez if he had fondled the girls, he responded, "No. They masturbated me."

10

### 2. Gonzalez's Testimony

Gonzalez began his testimony by talking about his educational background, his criminal background, and his substance-abuse history. Gonzalez dropped out of school in the sixth grade and had not obtained his GED while in prison. Around the time that Gonzalez dropped out of school, he began using drugs and committing crimes. Gonzalez started using alcohol around age twelve or thirteen and continued using and abusing it throughout his life. Gonzalez began using marijuana around age twelve, started using harder drugs around age fifteen or sixteen, and started using drugs on a daily basis around age eighteen or nineteen. Gonzalez's arrests began at age fourteen when he was arrested for a curfew violation and for possession of marijuana. Gonzalez attributed the many arrests that followed to his drug and alcohol use. While Gonzalez had been in prison, he had not received any treatment for his substance abuse.

Gonzalez testified that before going to prison for the 1992 indecency offense, he was accused of sexually assaulting his deaf relative. Gonzalez said that he did not do anything and that a retaliatory sister had called the police because she was mad at him for telling her not to hang out with certain individuals. Gonzalez said that the indictment involving sexual acts against his deaf relative was dismissed. When presented with a certified copy of an indictment alleging that Gonzalez had been indicted for two counts of felony sexual assault against his deaf relative, he said, "That's not true." Gonzalez also disagreed with the motion for dismissal, which

11

stated that the indictment had been dismissed because Gonzalez "was convicted in another case or count."

Gonzalez agreed that on the date alleged in that indictment, he had been alone with his deaf relative and that she had been asleep in a room. Gonzalez agreed that he and his deaf relative were there when the police arrived, but he denied that she had (1) motioned to the police and pointed at him and (2) pointed at her vagina and her butt and then pointed at him.[4] Gonzalez also denied that he had pulled off her pants, had put his penis in her mouth, had put his penis in her vagina, and had held her arms down while sexually assaulting her.

In addition to the allegations involving his deaf relative, Gonzalez admitted that he had played "doctors and nurses" with the retaliatory sister when he was about ten years old and that he was not using drugs at that time. He said that he had touched her vagina more than once, that it was not forced, and that she had touched his privates.

Gonzalez acknowledged that he had pleaded guilty to an indecency with a child by sexual contact that had occurred in 1992 and was sentenced to six years' confinement. Gonzalez said that he was thirty-five years old at the time of the offense and that he had met the victim at the swimming pool at the apartment complex where they both lived. Gonzalez explained that he had been in the pool drinking, that the victim had pulled down his shorts, and that he had started touching

---

[4]Gonzalez explained that his deaf relative used sign language most of the time.

12

her vagina. Gonzalez claimed that he was "absolutely without a doubt drunk at the time and . . . on drugs" because he had not committed "anything" when sober. A few moments later during his testimony, Gonzalez said that he had never mentioned a swimming pool and that he had not touched the victim in the swimming pool, but that he had touched her vagina and had rubbed her buttocks while she was clothed when they were lying on a bed. Gonzalez recalled that the victim had tried to move away from him. Gonzalez testified that he "might have" told the victim not to tell anyone about the incident when he had touched her. Gonzalez said that the victim did not tell her Mother until later when the victim "happened to walk by" while Gonzalez was relieving himself outdoors.

Gonzalez also admitted that in 2007 he had pleaded guilty to a charge for indecency with a child by sexual contact for which he was sentenced to fifteen years' confinement and for which he was still incarcerated at the time of the trial. Gonzalez agreed that at the time of the offense, he was forty-nine years old; he said that one of the victims was ten or eleven years old and that the other was twelve or thirteen years old. When asked what he did, Gonzalez responded, "That whole thing goes back to when I was doing the masturbation . . . ." Gonzalez said that the two girls masturbated him. Gonzalez said that "nothing was forced. Nobody was forced on anything." Gonzalez said that "the stuff started in 2006." He said that several children had come over to spend the night and that they had watched cartoons. When Gonzalez returned from a trip to the bathroom, the children had put "on a

13

porno." Gonzalez testified that he had told them not to do that but that they had responded that their parents let them watch porn. So he sat and watched the pornographic movie with the children. Gonzalez said that one of the girls, who was twelve or thirteen years old, had voluntarily showed him her breasts. When Gonzalez was in his bed masturbating, two of the girls came in; and "that's when [he] asked them . . . knowing that it -- that it was wrong." Gonzalez had them masturbate him until he ejaculated.

Gonzalez said that his thoughts and feelings during the offenses were centered on selfishness and self-gratification. Gonzalez knew that his actions were wrong, but he was "so high at that time" that he "did things that [he] just didn't have control [over due to] being under the influence of drugs and alcohol." He clarified, "I'm not blaming that only. I'm saying that what I've done was wrong[,] and I admit it . . . ." Gonzalez also admitted that he had hurt the victims, that "[i]t was horrible," and that he "was a monster." Gonzalez claimed that Dr. Dunham's testimony—that Gonzalez did not have remorse—was untrue; Gonzalez said, "It hurts what I did[,] and I know that I done wrong to the people when I touched them. I done wrong to them."

Gonzalez testified that he had completed a nine-month sex-offender treatment program in prison and that he did not believe that he needed additional sex-offender treatment. But he could not recall exactly what his triggers were. Nor could he say why he had sexually offended against children, only that he did so when he was on drugs and alcohol and that he was "not gonna go back to alcohol" and wanted

14

"nothing to do with drugs in [his] entire life from here on." When asked if he had sexually deviant thoughts about children, Gonzalez answered, "I never just think about it right there and then, it just happens at the moments when I'm wasted on whatever drugs I do or whatever, the alcohol that I've been taking. I don't know how to say that. I'll just say no." Although Gonzalez claimed that he was not sexually attracted to children, he admitted that being around children is a high risk factor for him to reoffend and that being in a structured setting like prison had prevented him from offending against children.

Gonzalez did not believe that he was a threat to the community because he had been reborn as a Christian during the fifteen years that he had been in prison. He said that his thinking had changed and that he would not reoffend because he trusts in God.

### 3. Disposition

After hearing the testimony summarized above, the jury answered "yes" to the question of whether it had found beyond a reasonable doubt that Gonzalez is an SVP. The final judgment recited the jury's verdict and ordered that Gonzalez be civilly committed as an SVP for treatment and supervision in accordance with Section 841.081 of the Texas Health and Safety Code. The record also includes an order of commitment.

Gonzalez filed a motion for new trial. The motion was overruled by operation of law, and Gonzalez filed a notice of appeal.

15

**III. Sufficient Evidence Supports the Civil-Commitment Order.**[5]

In his second and third issues, Gonzalez challenges the legal and factual sufficiency of the evidence. In his second issue, Gonzalez argues that the evidence is legally insufficient to establish that he suffers from a behavioral abnormality when the evidence shows that his most recent sexual encounter with a child was committed intentionally. Specifically, Gonzalez contends that the State

> **cannot have it both ways.** Either Mr. Gonzalez can control his behavior or he cannot; he either (a) acquired a serious difficulty in controlling his behavior after the [State] obtained a conviction of him for an *intentional* act of indecency with a child occurring in 2006, or (b) that conviction indicates only that he is merely a "typical recidivist convicted in an ordinary criminal case." [*See Kansas v.*] *Crane*, 534 U.S. [407,] 413, [122 S. Ct. 867, 870 (2002)].

In his third issue, Gonzalez argues that the evidence is factually insufficient for the same reason. As discussed below, the statute describing sexually violent offenders specifically lists offenses, like indecency with a child, that require an intentional mens rea, thus showing that an SVP can have a predisposition to commit a sexually violent offense and the capability of forming the mens rea of acting intentionally.

**A. Standard of Review**

The Texas Supreme Court has set forth the standard of review that we apply to legal- and factual-sufficiency challenges in the SVP setting as follows:

> A commitment proceeding under the SVP Act is the unusual civil case incorporating the "beyond a reasonable doubt" burden of proof typically

---

[5]We address Gonzalez's issues out of order because his legal-sufficiency challenge is potentially dispositive and, if upheld, would afford him the most relief.

reserved for criminal cases. *In re Commitment of Fisher*, 164 S.W.3d 637, 639–41 (Tex. 2005). While we have never evaluated the effect of such a high burden of proof on the standards for conducting evidentiary-sufficiency reviews on appeal, we have clarified those standards with respect to cases involving an intermediate "clear and convincing" burden. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). In doing so, we have recognized that "the burden of proof at trial necessarily affects appellate review of the evidence." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). Irrespective of the burden of proof, however, the jury remains "the sole judge of the credibility of witnesses and the weight to be given to their testimony." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *see also C.H.*, 89 S.W.3d at 26. To that end, the standards we have articulated for both legal-[ ]and factual-sufficiency reviews of findings that must be proven by clear and convincing evidence "honor not only the elevated burden of proof[] but also the deference an appellate court must have for the factfinder's role." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). The distinction between the two types of review "lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.*

A legal-sufficiency review of a finding that must be proven by clear and convincing evidence requires that the court review the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding was true. *J.F.C.*, 96 S.W.3d at 266. The court must "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* The court may not disregard undisputed facts that do not support the finding. *Id.*

By contrast, a factual-sufficiency review is premised on consideration of the entire record. *Id.* The assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so remains. *Id.* However, rather than "disregard" disputed evidence that a reasonable factfinder could not have credited in favor of the finding, the court must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *Id.* By logical extension, in an SVP case where the burden of proof is beyond a reasonable doubt, the evidence is

17

factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the SVP finding, along with the undisputed facts that do not support the finding, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met. *See id.*; *A.C.*, 560 S.W.3d at 631.

*In re Commitment of Stoddard*, 619 S.W.3d 665, 674–75 (Tex. 2020) (footnotes omitted).

## B. Applicable Law

The governing statute states that a person is an SVP if the person "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." Tex. Health & Safety Code Ann. § 841.003(a). With regard to the first prong of the SVP test, "[a] person is a repeat sexually violent offender . . . if the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses." *Id.* § 841.003(b).[6] The term "sexually violent offense" means

(A) an offense under Section 21.02, 21.11(a)(1), 22.011, or 22.021, Penal Code;

(B) an offense under Section 20.04(a)(4), Penal Code, if the person committed the offense with the *intent* to violate or abuse the victim sexually;

(C) an offense under Section 30.02, Penal Code, if the offense is punishable under Subsection (d) of that section and the person

---

[6]This statute provides an alternative if the person was convicted but received deferred adjudication. *See* Tex. Health & Safety Code Ann. § 841.003(b)(1)–(2). Because that scenario is not presented in the facts here, we do not set forth that portion of the definition of "repeat sexually violent offender."

committed the offense with the *intent* to commit an offense listed in Paragraph (A) or (B);

(D) an offense under Section 19.02 or 19.03, Penal Code, that, during the guilt or innocence phase or the punishment phase for the offense, during the adjudication or disposition of delinquent conduct constituting the offense, or subsequently during a civil[-]commitment proceeding under Subchapter D, is determined beyond a reasonable doubt to have been based on sexually motivated conduct;

(E) an attempt, conspiracy, or solicitation, as defined by Chapter 15, Penal Code, to commit an offense listed in Paragraph (A), (B), (C), or (D);

(F) an offense under prior state law that contains elements substantially similar to the elements of an offense listed in Paragraph (A), (B), (C), (D), or (E); or

(G) an offense under the law of another state, federal law, or the Uniform Code of Military Justice that contains elements substantially similar to the elements of an offense listed in Paragraph (A), (B), (C), (D), or (E).

*Id.* § 841.002(8) (emphasis added). Included within the offenses listed above is indecency with a child, which is described in Texas Penal Code Section 21.11 as follows:

A person commits an offense if, with a child younger than 17 years of age, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, the person:

(1) engages in sexual contact with the child or causes the child to engage in sexual contact; or

(2) with *intent* to arouse or gratify the sexual desire of any person:

(A) exposes the person's anus or any part of the person's genitals, knowing the child is present; or

19

(B) causes the child to expose the child's anus or any part of the child's genitals.

Tex. Penal Code Ann. § 21.11(a) (emphasis added).

With regard to the second prong of the SVP test, the statutory definition of "behavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." Tex. Health & Safety Code Ann. § 841.002(2). The person's ability to control the behavior is at the heart of the second prong as recently summarized by the Texarkana Court of Appeals:

> "The United States Supreme Court requires proof that the person 'has "serious difficulty in controlling [his] behavior" in order to civilly commit him under any [sexually-violent-predator] statute.'" [*In re Commitment of Renshaw*, 598 S.W.3d 303, 306 (Tex. App.—Texarkana 2020, no pet.)] (first alteration in original) (quoting *In re Commitment of Stuteville*, 463 S.W.3d 543, 552 (Tex. App.—Houston [1st Dist.] 2015, pet. denied)[] (citing . . . *Crane*, 534 U.S. [at] 413[, 122 S. Ct. at 870])). "The inability to control one's behavior 'must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.'" *Id.* (quoting *Stuteville*, 463 S.W.3d at 552[] (quoting *Crane*, 534 U.S. at 413[, 122 S. Ct. at 870])).

> "With regard to Chapter 841 of the Texas Health and Safety Code, Texas courts have 'held that a "behavioral abnormality" is considered "an abnormality which causes serious difficulty in behavior control."'" *Id.* (quoting *Stuteville*, 463 S.W.3d at 552[] (quoting *In re Commitment of Almaguer*, 117 S.W.3d 500, 506 (Tex. App.—Beaumont 2003, pet. denied))[)]. "Thus, '[w]hen a jury finds that a person is a sexually violent predator, that finding entails an implicit determination that the respondent has serious difficulty controlling behavior.'" *Id.*

20

(alteration in original) (quoting *Stuteville*, 463 S.W.3d at 552[] (citing *Almaguer*, 117 S.W.3d at 505–06)[)]. "Also, 'a jury may infer that a respondent has serious difficulty controlling his current behavior based on his past behavior.'" *Id.* at 306–07 (quoting *Stuteville*, 463 S.W.3d at 552[] (citing *In re Commitment of Washington*, No. 09-11-00658-CV, 2013 WL 2732569, at *5–6 (Tex. App.—Beaumont June 13, 2013, pet. denied) (mem. op.))[)].

*In re Commitment of Thompson*, No. 06-20-00024-CV, 2020 WL 6066205, at *1 (Tex. App.—Texarkana Oct. 15, 2020, pet. denied) (mem. op.).

## C. Analysis

Here, it is apparently Gonzalez's argument that because the determination regarding whether he is an SVP requires proof of his inability to control his behavior, such determination is inconsistent with the determination that he had the requisite mens rea in 2006 to commit the offense of indecency with a child. He argues that because he could not have been guilty of committing indecency with a child in 2006 unless he had formed the intent to do so, this prior conviction demonstrates (1) that he is simply dangerous but not a person lacking in control or (2) that the finding that he is an SVP in the present proceeding demonstrates that he could not have formed the requisite mens rea in 2006. Gonzalez's sufficiency arguments—that the evidence of a behavioral abnormality is legally and factually insufficient solely because his most recent sexual conviction was committed intentionally—equate a predisposition (i.e., "I was made this way") with an inability to intentionally commit an offense. In essence, Gonzalez is arguing that his ability to form the mens rea necessary for a criminal conviction excludes the possibility that he could suffer from the behavioral

21

abnormality that is the basis for an SVP finding. This has never been the law[7] and is not borne out in the SVP Act.

Instead, the governing statute required the State to prove that Gonzalez (1) is a repeat sexually violent offender and (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See* Tex. Health & Safety Code Ann. § 841.003(a). Gonzalez does not argue that either prong was not proven, only that the two cannot coexist. But the statute's first prong—which encompasses having repeat convictions for sexually violent offenses that have an intentional mens rea (like indecency with a child)—does not negate the second prong—which encompasses a congenital or acquired condition that predisposes the person to commit a sexually violent offense to the extent that the person becomes a menace to the health and safety of another person. *See id.* §§ 841.002(8), .003(a); *see also Commitment of Fisher*, 164 S.W.3d at 649 (stating that the SVP Act "lacks the scienter requirement typically found in criminal statutes"). The SVP Act therefore specifically contemplates that an individual (like Gonzalez) who has committed the intentional offense of indecency with a child and who has a predisposition to commit a sexually violent offense can be found to be an SVP. Thus, the wording of the statute itself nullifies Gonzalez's argument.

---

[7]*See generally Dooley v. State*, 582 S.W.3d 309, 312–13 (Tex. App.—Fort Worth 2018, no pet.) (explaining that diminished capacity is an excuse but does not negate the ability to form a mens rea).

22

Gonzalez does not otherwise challenge the legal or factual sufficiency of the evidence, but suffice it to say that Dr. Dunham testified at length about his conclusion that Gonzalez has a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence to the extent that he becomes a menace to the health and safety of others. Dr. Dunham opined that Gonzalez is within the small but extremely dangerous group of sexual predators that the legislature described in the SVP Act and discussed the factors that had contributed to Gonzalez's behavioral abnormality, including "[h]is sexual deviancy, in particular, his pedophilia, and also his antisocial orientation, and more specifically, his psychopathic personality disorder." Dr. Dunham reviewed various risk factors, including the number of Gonzalez's victims, which extended beyond his convictions; the pattern of behavior that was spread out over twelve years; the fact that he reoffended after incarceration; that the victims were children and were unrelated; his antisocial-personality disorder; that some of the acts included physical acts of force and threatening to kill someone if the victim told; his substance abuse; and his poor dynamic risk factors (i.e., lacking remorse, blaming victims, and poorly appraising his own risk). Gonzalez, through his trial testimony, disputed that he was attracted to young girls and contended that the only reason he had offended was due to alcohol and drugs, which he said he no longer had any desire to use. But the fact finder did not have to believe Gonzalez's testimony disputing the underlying facts on which Dr. Dunham's opinion was based.

23

Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the behavioral-abnormality prong of the jury's SVP finding. *See In re Commitment of Dever*, 521 S.W.3d 84, 87–88 (Tex. App.—Fort Worth 2017, no pet.). We overrule Gonzalez's second and third issues.

## IV. The Trial Court Properly Denied Gonzalez's Proposed Instruction.

In his first issue, Gonzalez argues that the jury charge was not "sufficiently specific for the jury to realize that the four allegations in question[—]one of [which was based on] a dismissed indictment[—]could be considered *only* as a basis for the [State's] expert's opinion[] and not for the truth of the matters asserted." As discussed below, we overrule the issue because Gonzalez's argument on appeal does not match the argument that he made in the trial court and is not preserved and because even if preserved, the trial court's concern about highlighting certain allegations was valid, and the charge included a proper limiting instruction.

### A. Standard of Review

A trial court's decision to refuse a particular instruction in its charge is reviewed for an abuse of discretion. *Commitment of Stuteville*, 463 S.W.3d at 554 (citing *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012)). A trial court may refuse to give a requested instruction or definition that is not necessary to enable the jury to render a verdict, even if the instruction or definition is a correct statement of the law. *Id.* (citing *In re*

*Commitment of Taylor*, No. 09-10-00231-CV, 2010 WL 4913948, at *1–3 (Tex. App.—

Beaumont Dec. 2, 2010, no pet.) (mem. op.)).

## B.    Applicable Law

The law on preserving charge error is as follows:

> To preserve charge error for review, a party must "point out distinctly
> the objectionable matter and the grounds of the objection." Tex. R. Civ.
> P. 274.  "Any complaint as to a question, definition, or instruction, on
> account of any defect, omission, or fault in pleading, is waived unless
> specifically included in the objections." *Id.*  An objection does not
> satisfy [R]ule 274 unless "the defect relied upon by the objecting party
> and the grounds of the objection are stated specifically enough to
> support the conclusion that [the] trial court was fully cognizant of the
> ground of complaint and deliberately chose to overrule it." *Carousel's
> Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 404 (Tex.
> App.—Houston [1st Dist.] 2004, pet. dism'd).  A party must "clearly
> designate the alleged error and specifically explain the basis of its
> complaint in its objection to the charge." *Id.* at 404–05; *see also C.M.
> Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 793 (Tex. App.—Houston
> [1st Dist.] 2004, no pet.) ("To be sufficiently specific, the party's
> objection must identify the claimed error and explain the basis of the
> party's complaint.").  If a party fails to lodge an objection to the jury
> charge that timely and plainly makes the trial court aware of the
> complaint, error is not preserved and the complaint is waived. *Ford
> Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007); *State Dep't of
> Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (op.
> on reh'g).  On appeal, the charge error complained of must comport
> with the objections made at the charge conference. *Cont'l Cas. Co. v.
> Baker*, 355 S.W.3d 375, 383 (Tex. App.—Houston [1st Dist.] 2011, no[]
> pet. . . .); *Wackenhut Corrections Corp. v. de la Rosa*, 305 S.W.3d 594, 616
> (Tex. App.—Corpus Christi[–Edinburg] 2009, no pet.).

*Hamid v. Lexus*, 369 S.W.3d 291, 296 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

An objection accompanied by a request that clearly reflects the complaint's basis can

suffice to preserve charge error. *See Thota*, 366 S.W.3d at 691.

25

## C.    The Charge Conference

During the charge conference, Gonzalez provided the State and the trial court with "Defendant's Requested Jury Instruction No. 1" and requested that it replace a portion of the State's requested Jury Instruction No. 1. Similar to the State's requested instruction, Gonzalez's requested jury instruction contained a definition of "hearsay" and included a limiting instruction on the use of hearsay information reviewed by an expert. But Gonzalez's requested instruction went on to set forth specific allegations that the jury was not to consider "for the proof of the matter asserted." The full text of Gonzalez's requested instruction follows:

> Hearsay is a statement that[] 1) the declarant does not make while testifying at the current trial or hearing and 2) a party offers in evidence to prove the truth of the matter asserted in the statement. Hearsay normally is not admissible. In this case, certain hearsay information contained in records reviewed by an expert or experts was admitted before you through expert testimony. Such hearsay was admitted only for the purpose of showing the basis of the expert's opinion and cannot be considered as evidence to prove the truth of the matter asserted.
>
> Such hearsay evidence that you are instructed to not consider for the proof of the matter asserted includes but is not limited to the following referenced in Dr. Dunham's testimony by transcript:
>
> 1.    Allegations that [Gonzalez] sexually assaulted [C.G.] on or about May 15, 1994;
>
> 2.    Allegations that [Gonzalez] performed any penetrative sexual assault against [V.R.] on or about August 21, 1992;
>
> 3.    Allegations that [Gonzalez] used threats of violence or violence against [V.R.] on or about August 21, 1992;

26

4.      Allegations that [Gonzalez] performed any penetrative sexual assault against Pseudonym 17-06-15 on or about June 24, 2006;

5.      Allegations that [Gonzalez] used threats of violence or violence against Pseudonym 17-06-15 on or about June 24, 2006;

6.      Allegations that [Gonzalez] committed sexual assault against other children on or about June 24, 2006; [and]

7.      Allegations that [Gonzalez] used threats of violence or violence against other children on or about June 24, 2006.

The State objected to Gonzalez's instruction, noting that the State's proposed jury instruction notified the jury that it had heard certain hearsay information through the expert and explained how it could consider that testimony.

After reviewing the proposed charges, the trial court confirmed that the State's proposed charge was one that had been approved in numerous other trials and had been upheld "[e]xactly as is" numerous times. The trial court then expressed concern that Gonzalez's requested instruction "could perhaps do more harm than good in that it brings up specific acts of violence and sexual assault." Defense counsel argued that the allegations against Gonzalez that he had denied were "so bad that [the jury] ought to be reminded that the stuff that Dr. Dunham was allowed to consider for purposes of forming his opinion is not stuff that they can consider for . . . the truth of the matter asserted." The State responded,

27

I think pointing some of these out, it's . . . confusing to the [j]ury and makes it sound like they can't even consider any of this evidence at all. But they can consider what [Gonzalez] said about these incidents and what he did or did not do. [Gonzalez's proposed] instruction makes it sound like, well, you really can't consider any of this evidence.

After hearing additional argument from both sides, the trial court denied Gonzalez's requested Jury Instruction No. 1. The charge that was given to the jury included only the first paragraph of Gonzalez's requested instruction.

### D. Analysis

Here, Gonzalez's argument on appeal differs from the argument that he made in the trial court. As set forth above, Gonzalez argued in the trial court that the seven allegations needed to be identified because they were "so bad" (as compared to the acts in other SVP cases) that the jury needed to be reminded it could not consider those specific alleged acts as truth. Yet this does not comport with Gonzalez's arguments on appeal: (1) that the jury needed more guidance as to what four of the specific allegations were because they were left in the dark about which hearsay statements were being referred to in the charge and therefore had to try to guess in following the court's instruction; and (2) that the instruction as given did not perform its function as a limiting instruction because of the time that had passed between when the jury initially heard the hearsay statements and when the general instruction was given.

Alternatively, even had Gonzalez preserved his complaint, we hold that the trial court did not abuse its discretion. The State noted during the charge conference that

28

Gonzalez's requested instruction, which highlighted specific allegations, could confuse the jury, and the trial court expressed concern that Gonzalez's requested instruction "could perhaps do more harm than good in that it brings up specific acts of violence and sexual assault."[8]  Gonzalez does not challenge the validity of the trial court's concern.  Additionally, he does not even mention several of the acts itemized in the proposed instruction and provides no justification for excluding those acts from the instruction but not the others.  By not even mentioning on appeal certain of the acts set forth in his proposed instruction, Gonzalez tacitly validates the trial court's expressed concern over submitting an instruction that highlighted acts to his disadvantage and potentially sowed confusion.  Furthermore, the trial court gave an instruction limiting how the jury could interpret the hearsay information reviewed by an expert, and we presume that the jury followed the instruction.  *See In re Commitment of Green*, No. 13-20-00082-CV, 2021 WL 5453966, at *8 (Tex. App.—Corpus Christi–Edinburg Nov. 23, 2021, no pet.) (mem. op.) ("In the absence of evidence to the contrary, we presume the jury followed the court's limiting instruction."); *In re*

---

[8]Although this is not a criminal case, we note that the Texas Court of Criminal Appeals has stated that

> [e]ven a judge's innocent attempt to provide clarity for the jury by including a neutral instruction can result in an impermissible comment on the weight of the evidence because the instruction "'singles out a particular piece of evidence for special attention,'" which the jury may then focus on as guidance from the judge.

*Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019) (citations omitted).

*Commitment of S.D.*, No. 10-17-00129-CV, 2020 WL 103721, at *5 (Tex. App.—Waco Jan. 8, 2020, no pet.) (mem. op.). Under these facts, we cannot say that the trial court abused its discretion by denying Gonzalez's requested jury instruction.

Accordingly, we overrule Gonzalez's first issue.

## V. The Trial Court Did Not Abuse Its Discretion by Allowing the State's Expert to Testify Regarding Gonzalez's Unadjudicated Offenses.

In his fourth issue, Gonzalez argues that the trial court abused its discretion when it allowed the State to read to the jury Dr. Dunham's deposition testimony regarding "mere allegations of prior sexual offenses" and unadjudicated, extraneous offenses, which were not helpful to the jury in determining a fact in issue. Gonzalez contends that "[t]o allow a party to show the jury mere allegations makes a mockery of Rule 705. That rule was . . . not [promulgated] to enable a party to adduce accusations with no discernable substance, particularly those without even the name of the accuser . . . . The [State] got an unfair advantage thereby." In his fifth issue, Gonzalez argues that the probative value of the extraneous offenses was substantially outweighed by their prejudicial effect. As explained below, we have previously held that such evidence can be relevant for the jury to reach its decision, that such evidence is not inherently unduly prejudicial, and that no abuse of discretion necessarily occurs when an expert is allowed to testify about having relied on such allegations in forming an opinion on the existence of a behavioral abnormality. We see no need to depart

30

from our prior precedent and, having considered the trial court's decision on the facts of this case, hold against Gonzalez on his fourth and fifth issues.

## A.    Standard of Review

A trial court's rulings admitting or excluding evidence are reviewable under an abuse-of-discretion standard. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

## B.    Applicable Law

Under Texas Rule of Evidence 705, "an expert in a[n] SVP Act civil[-]commitment proceeding may disclose the underlying facts or data upon which the expert bases his or her opinion if it is of a type of information relied on by experts in the field when forming opinions on the subject." *In re Commitment of Guest*, No. 02-19-00295-CV, 2021 WL 1245087, at *8 (Tex. App.—Fort Worth Apr. 1, 2021, pet. denied) (mem. op.) (citing *In re Commitment of Cain*, No. 02-18-00043-CV, 2018 WL 5993335, at *2 (Tex. App.—Fort Worth Nov. 15, 2018, no pet.) (mem. op.)). Having an expert in an SVP Act case explain the facts that he considered—including the accused's past sexual offenses, both adjudicated and unadjudicated—and how those

31

facts influenced his evaluation, assists the jury in weighing the expert's opinion on the ultimate issue. *Commitment of S.D.*, 2020 WL 103721, at \*4 (citing *Commitment of Stuteville*, 463 S.W.3d at 555).

However, there are limitations on such testimony as *Commitment of S.D.* explains:

> Rule of Evidence 705(d) regarding expert testimony states that "[i]f the underlying facts or data would otherwise be inadmissible, the proponent of [an expert] opinion may not disclose them to the jury if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect." Tex. R. Evid. 705(d). Rule of Evidence 403 further provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." [Tex. R. Evid.] 403. Factors considered when applying the Rule 403 balancing test "include the probative value of the evidence, the potential of the evidence to impress the jury in some irrational way, the time needed to develop the evidence, and the proponent's need for the evidence." *See* [*Commitment of*] *Stuteville*, 463 S.W.3d at 555 (quoting *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied)).

*Id.* at \*5.

## C.     Analysis

The issues that Gonzalez raises are similar to the arguments in *Commitment of Guest* in which we explained why it was permissible for the State's expert to testify about the details underlying the appellant's unadjudicated offenses and why such testimony was not unduly prejudicial:

> Although [appellant] argues that the details underlying his unadjudicated offenses were unnecessary for [the State's expert] to formulate his

32

opinion, [the expert's] testimony about the underlying facts helped the jury weigh his opinion and decide whether they agreed that [appellant] had a behavioral abnormality that would predispose him to commit sexual offenses. This was the ultimate issue that the jury was tasked with deciding, and the information that [the expert] provided regarding [appellant's] unadjudicated offenses was relevant to its decision. *See In re Commitment of Young*, 410 S.W.3d 542, 557 (Tex. App.—Beaumont 2013, no pet.) (holding in an SVP case that having an expert explain the facts he considered and how those facts influenced his evaluation, assists the jury in weighing the expert's opinion on the ultimate issue); *In re Commitment of Day*, 342 S.W.3d 193, 199 (Tex. App.—Beaumont 2011, pet denied) ("We hold [that] the trial court acted within its discretion in allowing the experts to discuss the details of the offenses and other bad acts committed by Day that are contained in the records they reviewed."); *In re Commitment of Miller*, 262 S.W.3d 877, 894 (Tex. App.— Beaumont 2008, pet. denied) (holding evidence about the accused's past sexual offenses, both adjudicated and unadjudicated, assisted in demonstrating whether the accused has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence—the ultimate issue that the jury must determine in an SVP Act case).

. . . .

[Appellant] also claims that the admission of the details surrounding his uncharged sexual offenses was unduly prejudicial to his case. [Appellant] argues that [the expert] could have effectively related and explained his opinion in this case without revealing the "sordid, yet unproven, allegations of [appellant's] two unadjudicated sex offenses." Unadjudicated offenses, however, are not necessarily more prejudicial than probative when they serve the purpose of explaining the basis of an expert's opinion. *See . . . Commitment of Stuteville*, 463 S.W.3d [at] 555–56 . . . (holding [that] trial court did not abuse its discretion by admitting evidence of uncharged sexual offenses defendant allegedly perpetrated against other victims for limited purpose of explaining basis of expert's opinion that defendant suffered from behavioral abnormality). Moreover, our sister courts have repeatedly upheld a trial court's decision to allow an expert to testify about the details of unadjudicated offenses in SVP cases. *See, e.g., In re Commitment of Johnson*, 613 S.W.3d 613, 615 (Tex. App.—San Antonio[] 2020[,] pet. denied) (holding [that] trial court did not abuse it[s] discretion by admitting evidence of appellant's unadjudicated sexual offenses because admission was not

unfairly prejudicial); . . . *Commitment of Renshaw*, 598 S.W.3d [at] 306 . . . (holding [that] experts in civil commitments may disclose underlying facts that the expert relied on, including the details of adjudicated and unadjudicated sexual assaults).

We cannot say that the trial court abused its discretion by determining that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. Based on this record, the trial court could have reasonably concluded that the facts and details related to [appellant's] unadjudicated offenses would be helpful to the jury in weighing [the expert's] testimony and in explaining the basis for his opinion that [appellant] suffers from a behavioral abnormality. Given the purpose for admitting this evidence and the trial court's limiting instruction, we hold that the trial court did not abuse its discretion by admitting evidence of unadjudicated offenses.

2021 WL 1245087, at *8–9.

Here, Dr. Dunham relied on at least one of the unadjudicated offenses—the acts that Gonzalez had perpetrated on his deaf relative—in formulating his opinion that Gonzalez suffers from a behavioral abnormality. Similar to the expert testimony in *Commitment of Guest*, Dr. Dunham's testimony about the underlying facts helped the jury weigh his opinion and decide whether they agreed that Gonzalez had a behavioral abnormality that would predispose him to commit sexual offenses. *See id.* at *8. Moreover, this was the ultimate issue that the jury was tasked with deciding, and the information that Dr. Dunham provided regarding Gonzalez's unadjudicated offenses was relevant to its decision.[9] *See id.*

___

[9]The focus of Gonzalez's briefing is the unadjudicated acts referenced in the indictment for the offenses against his deaf relative. Though he alludes to other acts, his attack is not that the information Dr. Dunham relied on related to acts that were uncharged; indeed, the information Dr. Dunham relied on related to the indecency

34

Regarding his Rule 403 challenge, Gonzalez distinguishes an SVP Act case in which a reviewing court held that "the probative value of the letter [written by the accused while in custody] and the State's need for the letter were high" because the accused "'denied or minimized *any* allegations of sexual deviancy' – which Mr. Gonzalez did not entirely do." Gonzalez next argues that the probative value of the unadjudicated offense in the indictment alleging that he had committed sexual offenses against his deaf relative was "nil"; that the allegations' potential to impress the jury with their inflammatory nature in an irrational way was "extreme"; that the State "took up part of the trial adducing the allegations"; and that Dr. Dunham did not need to bring forth the allegations because he had various test results and his interview with Gonzalez to which he could refer. Gonzalez then relies on a murder case to argue that his Rule 403 argument should be upheld.

Our analysis of the Rule 403 factors unfolds differently than Gonzalez has expressed. The unadjudicated offenses against his deaf relative had probative value because they were relied on by Dr. Dunham in formulating his opinion and assisted

charges for which Gonzalez was convicted. Instead, Gonzalez's attack is that he denied that certain details of how he committed the acts were accurate. But Gonzalez's own description of the details fluctuated during the course of his testimony and his discussion with Dr. Dunham regarding the facts underlying the convictions. Thus, Gonzalez's argument is not that the jury heard about uncharged offenses but that it should not have heard about the details of the convictions because he had not specifically pleaded guilty to committing the conduct detailed. He offers no authority to support this claim or his argument that delving into the details of facts underlying how the offenses occurred was not an appropriate topic for Dr. Dunham to consider in formulating his opinions.

35

the jury in understanding his opinion that Gonzalez suffers from a behavioral abnormality. *See Commitment of S.D.*, 2020 WL 103721, at *5. With regard to the potential of the evidence to impress the jury in some irrational way, we note that the trial court included a limiting instruction in the jury charge (as discussed in the first issue), and we presume that the jury followed the trial court's limiting instruction. *See id.* Gonzalez complains that the State "took up part of the trial adducing the allegations" but fails to explain that the portion of the trial spent on the allegations involving his deaf relative was minimal; the majority of the trial was spent on the facts surrounding his two convictions for sexual offenses and his other convictions for non-sexual offenses, his excuses, his diagnoses, and his risk factors to reoffend. And although Gonzalez did not "entirely" deny any allegations of sexual deviancy, he did deny many of the acts, including the alleged offenses against his deaf relative, and stated that various reports about his sexual acts were lies; therefore, the State's need for the evidence was high. Given the purpose for admitting the evidence, as explained above, we conclude that the admission of the evidence about Gonzalez's unadjudicated offenses with his deaf relative was not unfairly prejudicial. *See Commitment of Guest*, 2021 WL 1245087, at *9; *Commitment of S.D.*, 2020 WL 103721, at *6.

In light of the foregoing analyses, we hold that the trial court did not abuse its discretion by admitting evidence about Gonzalez's unadjudicated offenses. Accordingly, we overrule Gonzalez's fourth and fifth issues.

## VI. The Issue Challenging the Reliability of the State's Expert's Opinion Was Not Preserved and Does Not Present Fundamental Error.

In his sixth issue, Gonzalez argues that Dr. Dunham's testimony is not reliable because its foundation "at least partly rests on allegations that are neither information nor data nor corroborated nor any indication of guilt." Gonzalez acknowledges in his brief that his trial counsel did not object that Dr. Dunham's testimony was unreliable. But Gonzalez contends that the State's response during the pretrial hearing "hinted that it understood such an objection was being made."

We have reviewed the portion of the record from the pretrial hearing that Gonzalez cites and disagree with his conclusion. The portion of the record cited by Gonzalez contains an explanation by counsel for the State regarding why the unadjudicated offenses that Dr. Dunham relied on should not be excluded. At the conclusion of the dialog on that topic, the trial court denied Gonzalez's objections to items mentioned in 1A through G of his motion in limine, which listed various extraneous or unadjudicated offenses. No objection or ruling was made regarding the reliability of Dr. Dunham's deposition testimony.

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

37

Error that falls within the narrow category of "fundamental error" requires no trial-court predicate for appellate review. *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003). Fundamental error exists in rare instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or constitution of our state, or instances in which the record affirmatively and conclusively shows that the court rendering the judgment lacked subject-matter jurisdiction. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006).

Based on our review of the record, we hold that Gonzalez forfeited his issue challenging the reliability of Dr. Dunham's testimony. *See* Tex. R. App. P. 33.1(a)(1); *In re Commitment of Jones*, No. 02-18-00019-CV, 2022 WL 325390, at *5 (Tex. App.— Fort Worth Feb. 3, 2022, pet. filed) (op. on en banc reconsideration) (holding that appellant failed to preserve his argument because he did not object to the experts' opinions on the basis of unreliability).

Recognizing that we might conclude that he had not preserved this issue for review, Gonzalez further argues that we should deem his issue as fundamental error that is cognizable on appeal. Gonzalez contends that the alleged error adversely affects the interest of the public generally because

> [t]o water down psychology by permitting mere indictment allegations to suffice for empirical data, facts[,] or evidence is to deny it any semblance of the systematic knowledge constituting true science. And vast members of the public turn to psychologists for treatment and guidance. It would be a sad lookout for the public should the typical psychologist be widely deemed little more than a quack (defined as a "fraudulent healer or incompetent professional") who relies on utterly

38

> unsubstantiated allegations when reaching negative conclusions of the state's citizens. The public is also directly and adversely affected where it must unnecessarily pay to confine, house[,] and feed defendants even after they have served their sentences. [Footnote omitted.]

Gonzalez, however, points to no case in which the failure to object to the reliability of an expert's opinion was deemed as fundamental error, and we have found none. Instead, the Texas Supreme Court has explained that "when a reliability challenge requires the court to evaluate the . . . foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct [an] analysis" that "necessarily looks beyond what the expert said to evaluate the reliability of the expert's opinion." *Commitment of Jones*, 2022 WL 325390, at *5. We therefore decline to deem Gonzalez's issue challenging the reliability of Dr. Dunham's testimony—to which he did not object in the trial court—as raising fundamental error that is cognizable on appeal.

Accordingly, we overrule Gonzalez's sixth issue.

## VII. Gonzalez Has Not Demonstrated That His Initial Trial Counsel Was Ineffective.

In his seventh issue, Gonzalez argues that he was denied effective assistance of counsel when his initial trial counsel waived his right to a trial within a statutory deadline (which is waivable) by allegedly agreeing to a continuance without consulting him and without a judicial determination that he would suffer no substantial prejudice. Specifically, Gonzalez contends that his trial counsel provided ineffective assistance and waived his right to a trial by the deadline by failing to consult him before agreeing

39

to reset the initial trial setting beyond the statutory deadline. As explained below, we hold that Gonzalez failed to argue on appeal—and show at trial—how he was prejudiced by the continuance.

## A. Standard of Review

To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). We need not address both parts of the *Strickland* test if the appellant makes an insufficient showing on one component, nor do we need to address them in any particular order. 466 U.S. at 697, 104 S. Ct. at 2069.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Id.* at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069.

40

"[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

## B.  Analysis

Here, even if we assumed that trial counsel's performance was deficient, Gonzalez has failed to argue or show how his trial counsel's performance prejudiced him, stating only that he "may well have suffered substantial prejudice."[10]  To establish ineffective assistance, Gonzalez was required to show a reasonable probability that the proceeding would have turned out differently without the deficient performance.  *See Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.  Gonzalez, however, has not attempted to do so and has therefore failed to meet *Strickland*'s prejudice prong.

---

[10]Despite raising an ineffective-assistance claim, Gonzalez also states that "[p]rejudice is, after all, presumed after a delay of more than a year" and cites speedy-trial cases.  Gonzalez, however, does not mention that there are four factors in analyzing a speedy-trial violation and that length of delay is only one of the factors. *See Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972) (stating that the four-factor balancing test that weighs (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his speedy-trial right, and (4) prejudice suffered by the defendant as a result of the delay).  Nor does Gonzalez acknowledge that the State had a reason for the delay—jury trials were restricted in light of the Texas Supreme Court's emergency orders—and that he did not explain if or how he was prejudiced by any delay.

Accordingly, we overrule Gonzalez's seventh issue.[11]

## VIII. Conclusion

Having overruled each of Gonzalez's seven issues, we affirm the trial court's civil-commitment order.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: April 21, 2022

---

[11]Because we overrule Gonzalez's issue raising ineffective assistance, we deny as moot the request in his seventh issue that we remand his case to the trial court for a hearing on ineffective assistance.

42